## THE NATHAN HALE.

### THE DORIS.

(Circuit Court of Appeals, Second Circuit. January 7, 1902.)

### No. 82.

1. COLLISION—OVERTAKING VESSELS—PRESUMPTION OF FAULT.

Under article 24 of the navigation act of 1890, which provides that "every vessel overtaking any other shall keep out of the way of the overtaken vessel," where a tug with a tow saw a schooner a quarter of a mile ahead, on nearly the same course, and overtook and passed her, but the tow, which was on a 200-fathom line, did not see the schooner until within 200 feet, and struck her directly astern, negligence must be inferred on the part of both tug and tow, unless there is evidence to warrant a finding that the schooner in some way brought about the collision.

2. SAME—EVIDENCE CONSIDERED.

Evidence considered, and *held* not to sustain a claim made by a tug and tow that a schooner which they overtook, not seeing the tow, changed her course after the tug had passed and ran into its wake, thus causing by such act a collision between her and the tow, which struck her directly astern.

Appeals from the District Court of the United States for the Eastern District of New York.

This cause comes here upon appeal from a decree of the district court, Eastern district of New York (108 Fed. 552), holding the tug and the barge both liable for damages sustained by the schooner Florence Shay in consequence of a collision with the barge while in tow of the tug about 3 a. m. of August 22, 1900, in Hampton Roads. The stem of the barge struck the schooner directly on the stern, and, the schooner coming around after the impact, her bow also came in contact with the barge. The following excerpt from the brief of the counsel for the tug briefly indicates the principal facts which are not in dispute: "The Florence Shay was a small, three-masted schooner, laden with coal, bound into Hampton Roads for an anchorage on account of the strong N. E. wind outside. The Nathan Hale was returning to the roads with the barge Doris in tow for the same reason. * * * The hawser between the tug and tow was about 200 fathoms in length, the tide was turning flood, the night good for seeing lights, and the wind moderate from the N. E. The steam tug, after passing Old Point Wharf on a course S. W. by W., and steering for the light on the Middle Ground, sighted the schooner a little upon her port bow, and about a quarter of a mile away. The schooner also sighted the steam tug over her starboard quarter, the tug showing her red and towing lights, when about a quarter of a mile away. When the steam tug observed the schooner, her course was changed to half a point to starboard, and the schooner's course was changed to half a point to port; the steam tug having the light of the Middle Ground just over her port bow, and the schooner having the same light just over her starboard bow. The tug passed the schooner on her starboard side at a distance variously estimated at from 300 feet to 300 yards. The collision occurred off Hampton Bar, the stem of the barge striking the stern of the schooner. The schooner at the time had up all her lower sails."

Samuel Park, for the Nathan Hale.
Le Roy S. Gove, for the Doris.
Nelson Zabriskie, for appellee.

Before WALLACE and LACOMBE, Circuit Judges, and TOWNSEND, District Judge.

PER CURIAM. The opinion of the district judge will be found in 108 Fed. 552. It contains an exhaustive discussion of the evidence, which it seems unnecessary to reproduce here. Some of the propositions of fact which he found are controverted, and it is contended that in working out suggested movements of the vessels he overlooked some elements which should have been considered; e. g., that a luffing up by the schooner when she was going almost before the wind would have increased her speed, and that a barge as heavy as the Doris could not have swung far out of the wake of the tug without changing the tug's heading. But these minuter details of the argument contained in the opinion need not be considered. The fundamental ground for the decision is found in the opening statement of the opinion:

"The first obvious fact is that a schooner, which had been seen by those on a tug 1,500 feet away, was struck squarely in her stern by the tow, which did not see the schooner until within about 200 feet of her. From this fact negligence should be inferred both on the part of the tug and the barge, unless there is some fact which should modify or avoid that conclusion."

Article 24 of the act of 1890, as it stood when the collision happened, reads as follows:

"Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel."

Whether the distance at which the tug passed was greater or less, whether the courses were diverging or converging, whether or not the tug failed to warn its tow to follow the slight change to starboard which it made, whether the tow swung more or less out of the wake, is not material to the question presented here. The tug saw the schooner a quarter of a mile off, and saw in what direction she was going. The tow failed to see her till within 200 feet. Both tug and tow were overtaking vessels, and the latter ran squarely into the schooner's stern. In view of the rule, the only question seems to be, is there evidence which will warrant the finding that the schooner in some way brought about this catastrophe? There is some suggestion of an insufficient light astern, but, if she had none at all there, that circumstance would be immaterial, since it was so light that the schooner was visible a quarter of a mile away. That, when she sighted the tug, she changed a half point to port, is not charged as a fault. It was a change in avoidance of collision greater than she was required to make. All the rule asked of her was that she should keep her course. The tug and barge claim that the "schooner changed her course to starboard in order to approach the anchorage grounds, not having observed the barge." There is no evidence to support this proposition. The witnesses from the schooner testify that she made no such change. No witness called by either party asserts that he saw her on any such course. She was not on it when the tug passed her, nor when the tow sighted her, nor when she was struck. It is a theory advanced to account for the collision, under the assumption that the tug passed at a safe distance, and that the barge kept in her wake. The mere fact of collision, however, equally well supports the inference that claimants' witnesses are mistaken as to both these propositions. And in

this, as in all such cases, great weight may fairly be given to the improbability that a vessel, whose master knows she is being overtaken by a vessel, which is in such a position that she cannot help but know she is herself overtaking, should make any such change, when, under the plain text of the rule, no new navigation on her part is called for, and all she has to do is to keep her course, and let all overtaking vessels keep out of her way. It is sought to overcome this suggestion by contending that, after the tug had passed, the master of the schooner, who did not see the tow, would be likely to change to starboard to make an anchorage near Hampton Bar. But in our opinion the evidence does not warrant such a conclusion. The master of the schooner testified that he was bound up towards Middle Ground for an anchorage, where there was a little shoal water, which was about two miles beyond the place of collision; that he never anchored down at the place of collision, the water being 12 to 14 fathoms there,—too deep for his class of vessel,—whereas where he usually anchored, and intended to at this time, there were four or five fathoms, right up to the north and eastward of the Middle Ground light, between Hampton Bar and Middle Ground light. The mate of the schooner, in response to a question where they intended to anchor, replied, "Oh, around Hampton Bar." The chart indicates a bar which runs from Old Point to Newport News. It is designated as "Hampton Bar," its westerly end, opposite Middle Ground light, being designated as "Newport News Bar." Between that and Middle Ground light the water is 3½ to 5 fathoms. In answer to another question, he said they intended to anchor "somewhere on Hampton Bar to the eastward,—to southeast of us." Manifestly there is some clerical error in the record. To the "eastward" or "southeast" would be water beyond which the schooner had already passed. Further on in his cross-examination he stated that they made all ready for anchoring between the Capes and the Thimble; that at the time of collision they were all ready to let go the anchor; that they could not anchor at the place of collision, because there was too deep water; that they were intending to go up to the Middle Ground to anchor,—between Middle Ground and Hampton Bar,—in about 5 or 6 fathoms; and that in order to make the anchorage they would not have to change their course until they got a mile further up ("up-channel" he evidently meant), when a change from S. W. ½ S. to W. by N. would bring them where they wanted to go. These witnesses evidently designated the whole bar as "Hampton Bar," ignoring the fact that the chart designates its westernmost end as "Newport News Bar." Reading the testimony with chart before us, we are clearly of the opinion that at the moment of collision the schooner was a mile short of the place where it would be necessary to change her course—even if there were no other vessel to be considered—in order to make the anchorage she was aiming for. In view of this circumstance, we cannot find, in the absence of any evidence of a change of course, that she turned sharply to starboard and ran into the wake of the tug.

The decree of the district court is affirmed, with interest and costs.